FILED
Sep 07, 2022
01:32 PM(CT)
TENNESSEE
WORKERS' COMPENSATION
APPEALS BOARD



# TENNESSEE BUREAU OF WORKERS' COMPENSATION
## WORKERS' COMPENSATION APPEALS BOARD

| | | |
|---|---|---|
| Kaci L. Johnson | ) | Docket No. 2020-08-0731 |
| | ) | |
| v. | ) | State File No. 23720-2020 |
| | ) | |
| Inspire Brands d/b/a | ) | |
| Blazin Wings, Inc., et al. | ) | |
| | ) | |
| | ) | |
| Appeal from the Court of Workers' | ) | Heard August 10, 2022 |
| Compensation Claims | ) | via Microsoft Teams |
| Allen Phillips, Judge | ) | |

---

### Affirmed and Remanded

---

In this interlocutory appeal, the employee reported suffering a back injury when a large cooler fell on her at work. The trial court determined that the causation opinions of both the initial authorized physician and the subsequent authorized physician were entitled to the statutory presumption of correctness. The court then weighed the contradictory opinions, determined the initial authorized physician's opinion was entitled to greater weight, and concluded the employee had come forward with sufficient evidence to indicate a likelihood of prevailing on this issue at trial. As a result, it ordered the employer to provide the disputed surgery. The employer has appealed. Following a careful review of the record and the parties' arguments, we affirm the decision of the trial court and remand the case.

Judge Pele I. Godkin delivered the opinion of the Appeals Board in which Presiding Judge Timothy W. Conner and Judge Meredith B. Weaver joined.

A. Allen Grant and Benjamin T. Norris, Nashville, Tennessee, for the employer-appellant, Inspire Brands d/b/a Blazin Wings, Inc.

Monica Rejaei, Memphis, Tennessee, for the employee-appellee, Kaci L. Johnson

### Factual and Procedural Background

On April 4, 2020, Kaci L. Johnson ("Employee") was injured while working for Inspire Brands d/b/a Blazin Wings, Inc. ("Employer"), when a cooler estimated to weigh more than 300 pounds fell on the left side of her back, pinning her against a counter.

Employee was seen at Saint Francis Hospital-Bartlett's Emergency Room with complaints of left-sided back pain. A CT scan of Employee's chest and x-rays of her bilateral hip/pelvis area were normal. Upon discharge, Employee was prescribed pain medication and urged to follow up with her primary care physician and workers' compensation representative.

Two days later, Employee saw her chiropractor, Dr. Chancellor Johnson, and records of that visit reflect that Employee was "sore, but feeling a little better today." The records make no reference to the work incident. The next day, Employee was seen by Danielle Howell, a nurse practitioner at Methodist Healthcare. Employee provided a history of a cooler falling on her and striking her "back, left lower ribs and buttock at work." She complained of moderate middle lower back pain, which began three to four days prior to her visit. Employee was diagnosed with "[b]ack pain due to injury" and "[a]cute left-sided low back pain without sciatica." Employee was told she could return to work on Monday, April 13, and physical therapy would be ordered if needed.

Following that visit, Employee treated with MedPost Urgent Care ("MedPost") in Memphis, Tennessee. She was initially seen by a nurse practitioner at MedPost on April 9, and she reported that symptoms related to her injury had improved. Employee noted "pain in the left, posterior, lateral back which [she] described as aching with radiation to the left buttock." Employee's symptoms were aggravated by local pressure, movement, sitting, and walking. The nurse practitioner diagnosed Employee with "[a]cute left-sided low back pain without sciatica" and a contusion of the left side of Employee's back. Medical records reflect this was a "[w]ork related injury" and Employee was taken off work until her next visit. Employee returned for a follow-up visit on April 13 and reported that symptoms related to her injury had improved. She was prescribed a muscle relaxer to help with back pain and was released to return to work with light-duty restrictions. During that visit, an orthopedic referral was made for further evaluation of Employee's back pain.

Thereafter, Employee selected Dr. Jeffrey Dlabach, an orthopedic surgeon, from an Employer-provided panel. Employee first saw Dr. Dlabach on April 21 and provided a history of the incident and the medical care she had received to date. Medical records indicate Employee had returned to work with restrictions but was starting to have increased pain, including "having issues into her buttock and left leg . . . predominantly in the left lumbar area," and that this pain was now extending down into her left leg. Dr. Dlabach ordered an MRI of Employee's lumbar spine, which revealed degenerative disc changes at the L5-S1 level with slight retrolistheses and disc desiccation, and a left L5-S1 paracentral subannular disc protrusion. Following an epidural steroid injection, pain medication, and muscle relaxers, Employee reported no improvement. As a result, Dr. Dlabach referred her to a neurosurgeon for further evaluation.

Employee selected Dr. Fereidoon Parsioon from a panel of neurosurgeons, and he first evaluated her in August 2020. Employee reported back and left lower extremity pain

and described "[lightning] pain shooting down the leg to the ankle area and to the left big toe." Employee showed Dr. Parsioon a video of the work incident, and he reviewed the MRI report of Employee's lumbar spine. Significantly, according to Dr. Parsioon's report, Employee also indicated that she had not experienced "any previous back issues before this injury." The doctor diagnosed Employee with back and left lower extremity radiculopathy, prescribed physical therapy, and took Employee off work.

Dr. Parsioon next saw Employee in September 2020, and, after reviewing the MRI films of her lumbar spine from April, confirmed Employee had a ruptured disc on the left side at L5-S1. In an October follow-up visit, Dr. Parsioon noted Employee had failed to improve with conservative treatment and recommended surgery consisting of an L5-S1 partial hemilaminectomy and microdiscectomy.

Thereafter, Employer sent correspondence to Dr. Parsioon with an attached therapy note informing him that Employee had helped with "decorations and lifting/setting up" for a wedding on October 4. In the letter, Employer asked Dr. Parsioon if Employee had a new injury at that time, to which he responded "no." Dr. Parsioon also noted that he did not believe Employee's activities of October 4 contributed more than 50% to Employee's current condition. When asked whether Employee's work accident contributed more than 50% to her current condition, Dr. Parsioon responded "yes."

Dr. Parsioon's request for surgery was sent to utilization review, and the reviewing physician recommended that the surgery request not be certified because there was insufficient evidence supporting the need for the procedure. Upon administrative appeal, the Bureau's medical director upheld this decision. As a result, Dr. Parsioon agreed to perform Employee's surgery under her private insurance, and Employee filed a request for expedited hearing.

Prior to the expedited hearing being scheduled, Employee was evaluated by Dr. Samuel Murrell at Employer's request on March 17, 2021. After performing a physical examination and reviewing Employee's medical records, Dr. Murrell noted Employee sustained an injury on April 4, and, according to the medical records, she was working as a shift manager when a "600[-]pound refrigerator" fell and struck her in the back, pinning her to the ground.[1] He further noted that Employee had exhausted conservative treatment options, and he recommended surgery consisting of a left L5-S1 microdiscectomy. Thereafter, Employee withdrew her request for an expedited hearing, and Employer agreed to authorize surgery.

When the parties learned that Dr. Parsioon was not performing surgeries at that time, Employer provided a new panel of physicians that included Dr. Murrell. Employee

---

[1] The exact weight of the cooler was not established in the record, but Employer does not dispute that it was heavy.

3

selected Dr. Murrell as her authorized physician based on his representation that he believed surgery was reasonable and necessary to treat the work injury. Employee saw Dr. Murrell on June 23, and he recommended another MRI of her lumbar spine. Upon review of the new MRI, Dr. Murrell reiterated his recommendation for lumbar surgery.

Following Dr. Murrell's recommendation for surgery, Employer obtained Employee's chiropractic records from Arlington Family Chiropractic and Dr. Johnson. These records documented Employee's prior complaints of low-back pain dating back to October 2017 and included a diagnosis of segmental dysfunction at multiple levels of Employee's spine. Records further revealed Employee received treatment consisting of traction, electrical stimulation, and manipulation at the cervical, thoracic, and lumbar levels while receiving chiropractic care. Further, Employee saw Dr. Johnson two days before the April 4 work incident and complained that her right hip and right lower back were sore.

Employer provided Dr. Murrell with Employee's chiropractic records for review, and submitted four medical questionnaires related to Employee's condition, including the following causation inquiry:

> In your expert medical opinion and answered to a "reasonable degree of medical certainty," – that is without speculation or possibility – taking into account the video footage of [Employee's] alleged injury, the diagnostic imaging of [Employee's] lumbar spine to date, the medical records from [Employee's] chiropractors, and all information you believe is germane, is [Employee's] herniated disk at L5-S1 primarily related (more than 50%) to the work incident on April 4, 2020?

Dr. Murrell responded in the negative, and, as a result, Employer reversed its earlier decision to authorize surgery. Employee filed another request for an expedited hearing, and the parties agreed to obtain medical proof prior to scheduling the hearing.

Dr. Murrell's deposition was taken in November 2021, at which time he testified that Employee had a L5-S1 disc protrusion with left lumbar radiculopathy, noting "she did have degenerative changes, but there was also the disc protrusion on top of that." Dr. Murrell confirmed that he reviewed Employee's chiropractic records and testified that he did not see any MRI scans that were performed or any recommendations for orthopedic or neurosurgical evaluation during the course of her prior chiropractic treatment. He acknowledged viewing a video of the work incident and thought the counter seemed to break the fall and full impact of the cooler when it hit Employee. When questioned, Dr. Murrell agreed that Employee's leg pain developed after the work incident. At the conclusion of direct examination, Dr. Murrell addressed causation during the following exchange:

4

Q: . . . Would you mind clarifying your opinion? To a reasonable degree of medical certainty, is the need for her surgery and her diagnosis to the L5-S1 [disc] more than 50 percent related to the work injury?

A: If that history is correct, yes.

Q: And just to make sure we clarify, are you talking about the history in your medical records?

A: The history that she provided me.

Q: That she provided you. Okay. All right. So, I feel like I know the answer to this question, but I need to ask it. Is the surgery recommended medically necessary for her?

A: I believe so.

On cross-examination, Dr. Murrell testified that Employee's description of the work incident was different than what he observed in the video.[2] He reiterated his opinion that the full impact of the weight of the cooler did not fall on Employee and noted she was not pinned to the ground as indicated in his initial report. Dr. Murrell stated Employee had complaints of pain and stiffness in her lumbar spine in October 2017, prior to the work accident, and noted documentation of subluxation at L5 and adjustments made at L5-S1, the same level recommended for surgery. Dr. Murrell testified that Dr Johnson's medical records from two days prior to the incident also "suggest[ed] that [she wasn't] asymptomatic." When questioned as to whether degenerative changes themselves could lead to a disc protrusion such as that sustained by Employee, Dr. Murrell testified, in part:

So, again, she's got a disc protrusion there. Whether – she certainly was having issues with her back prior to the injury. We have one snapshot in time. It could very well have been that she had degenerative changes that led to a disc protrusion. There could be some very remote incident that is – is not even being discussed here, and those are all things that – that could have resulted in that disc protrusion.

At the conclusion of cross-examination, Dr. Murrell was asked to review the questionnaires previously sent to him by Employer. Following his review, Dr. Murrell testified it was still his opinion that Employee's condition is not more than 50 percent related to work. In addition, he agreed there is no further treatment for Employee's lumbar

---

[2] In his March 17, 2021 medical note, Dr. Murrell noted that "*[a]ccording to the medical records*," Employee was working when a "600[-]pound refrigerator fell and struck [Employee] on the back pinning her to the ground." (Emphasis added.)

5

spine that is medically necessary and more than 50 percent related to the work incident. When questioned about his seemingly contradictory testimony as to causation, Dr. Murrell stated he was getting "confused" before repeating his opinion that Employee's need for surgery at the L5-S1 level was not more than 50 percent related to the work incident.

On redirect examination, Dr. Murrell was asked to provide a percentage for his causation analysis, to which he responded "[p]robably 50/50." He expounded further by stating "I think that what I'm essentially saying is, we don't have something before and after that shows that the disc protrusion led to her – her symptoms, her radicular symptoms, and then I really don't have a crystal ball that says that that specific incident caused it." He testified that he "would feel much more confident in saying that [the work incident] caused it if – if she had never had any treatment previously, and I think that's the thing that makes it difficult." Dr. Murrell ultimately stated "the waters are sort of muddy. I think it will ultimately be up to the workers' compensation judge to decide whether this gets addressed." He went on to state, "And I wish I could help him or her, but I can't, and he's going to need to decide."

Dr. Parsioon's deposition was taken in March 2022. Dr. Parsioon testified that his causation opinion was "absolutely not" changed in any way after reviewing Employee's chiropractic records. He noted there was no reference to imaging or recommendation for Employee to see an orthopedic provider or neurosurgeon contained in any of the chiropractic records he reviewed. Dr. Parsioon testified that chiropractors "don't do back surgeries or spine surgeries" and stated that x-rays obtained by a chiropractor would not reveal a disc herniation. After reviewing the video of Employee's work incident again, Dr. Parsioon stated "you can't have a better traumatic injury than that for a ruptured disc in the spine." Dr. Parsioon repeated his opinion that Employee's condition was "more than 51 percent related to the work injury" and stated he was willing to perform surgery.

During cross-examination, Dr. Parsioon agreed that Employee was not entirely truthful when she denied having back issues prior to the work incident. Despite this, he testified on re-direct that Employee's chiropractic records provided no documentation of any sort of nerve impingement and noted "there is no leg pain. That's what is important. There is back pain, neck pain, thoracic pain. There is no radiation." Ultimately, Dr. Parsioon did not deviate from his opinion as to causation.

An expedited hearing was held on May 13, 2022, and Employee requested authorization for back surgery and attorneys' fees based on Employer's alleged wrongful denial of surgery. Conversely, Employer contended Employee had not shown her back condition was causally related to the work incident. Employee testified the chiropractic treatment she received was for aches and pains that were different than the disabling pain she currently was experiencing. Employee also testified that she was able to work until the April 4 incident and now is unable to work. Employee ascribed her current symptoms to

the work incident and contended she was entitled to attorneys' fees due to Employer's wrongful denial of surgery.

Employer argued that Employee was not credible and misled providers regarding her history of medical treatment for her back. In addition, Employer contended that Dr. Parsioon's "bias" against chiropractors influenced his opinions and that Dr. Murrell's causation opinion should be presumed correct pursuant to Tennessee Code Annotated section 50-6-102(14)(E). Employer asserted that Dr. Murrell became the authorized treating physician after Dr. Parsioon stopped treatment. Employer did not argue against the medical necessity of surgery for Employee but instead asserted that she failed to show a greater-than-fifty-percent correlation between the work incident and her injury.

In considering the causation opinions of both providers, the trial court first determined that the qualifications of each were essentially equal. The court also noted that because both providers were chosen from panels, each of their causation opinions was entitled to a presumption of correctness. Specifically, the court "reject[ed] [Employer's] argument that Dr. Parsioon's opinion lost its presumption when Dr. Murrell began treatment." The court considered the specialty of each physician, the proximity of their respective initial evaluations to the time of the work incident, and their treatment of Employee. The court also considered "the importance each expert attached to the [chiropractic] information" they reviewed. In giving more weight to Dr. Parsioon's opinion, the court noted that the chiropractic records contained information consistent with the testimony provided by Dr. Parsioon and a letter provided by Employee's chiropractor, Dr. Johnson, noting he found changes for "the worse" in Employee's condition following the work incident.

The court also considered photographs and social media evidence introduced by Employer at trial but noted Employee testified that although the photos accurately depicted her activities on those specific dates, she still felt pain on those occasions. In addition, the court determined Employee testified credibly that her disabling symptoms were related to the work incident. After considering the expert medical testimony in conjunction with Employee's lay testimony, the court accorded greater weight to Dr. Parsioon's causation opinion. The trial court ordered Employer to authorize and pay for the back surgery recommended by Dr. Parsioon and designated Dr. Parsioon as the treating physician, but it declined to address the claim for attorneys' fees for a wrongful denial under Tennessee Code Annotated section 50-6-223(d)(1)(B) until a later hearing. Employer has appealed.

**Standard of Review**

The standard we apply in reviewing the trial court's decision presumes that the court's factual findings are correct unless the preponderance of the evidence is otherwise. *See* Tenn. Code Ann. § 50-6-239(c)(7) (2021). When the trial judge has had the opportunity to observe a witness's demeanor and to hear in-court testimony, we give

considerable deference to factual findings made by the trial court. *Madden v. Holland Grp. of Tenn., Inc.*, 277 S.W.3d 896, 898 (Tenn. 2009). Moreover, a trial court has the discretion to determine which testimony to accept when presented with conflicting expert opinions, and we review such determinations using an abuse-of-discretion standard. *Johnston v. Siskin Steel & Supply Co.*, No. E2020-00799-SC-R3-WC, 2021 Tenn. LEXIS 241, at *30-31 (Tenn. Workers' Comp. Panel Feb. 10, 2021). However, "[n]o similar deference need be afforded the trial court's findings based upon documentary evidence." *Goodman v. Schwarz Paper Co.*, No. W2016-02594-SC-R3-WC, 2018 Tenn. LEXIS 8, at *6 (Tenn. Workers' Comp. Panel Jan. 18, 2018). We are also mindful of our obligation to construe the workers' compensation statutes "fairly, impartially, and in accordance with basic principles of statutory construction" and in a way that does not favor either the employee or the employer. Tenn. Code Ann. § 50-6-116 (2021).

## Analysis

In its brief on appeal, Employer first contends that when medical proof is limited to deposition testimony and other documentary evidence, we are to review the court's findings regarding the documentary evidence de novo without affording the trial court's conclusions a presumption of correctness. We previously addressed the appropriate standard of review for expert medical evidence in *Moore v. Beacon Transport, LLC*, No. 2018-06-1503, 2021 TN Wrk. Comp. App. Bd. LEXIS 39 (Tenn. Workers' Comp. App. Bd. Oct. 29, 2021).[3] In a concurrence, our colleague argued that documentary expert evidence is necessarily reviewed *de novo* on appeal. We disagreed, explaining as follows:

> [T]his approach ignores a substantial body of case law directing us to acknowledge the trial court's role as factfinder and accord the trial court the discretion to choose which expert offered the more probable explanation based on the totality of the evidence. This framework was discussed by the Supreme Court's Special Workers' Compensation Appeals Panel as recently as June 2021 in *Jumper v. Kellogg Co.*, No. W2020-01274-SC-R3-WC, 2021 Tenn. LEXIS 175 (Tenn. Workers' Comp. Panel June 23, 2021), a case in which the expert medical proof was by deposition: "When presented with conflicting expert opinions, a trial court *has discretion* to determine which testimony to accept . . . . A trial court abuses its discretion when it applies an incorrect legal standard, reaches an illogical result, or bases its decision on a clearly erroneous assessment of the evidence." *Id.* at *17-18 (internal citations omitted). The Tennessee Supreme Court adopted the Appeals Panel's opinion in *Jumper* as its own. *See Jumper v. Kellogg Co.*, No. W2020-01274-SC-R3-WC, 2021 Tenn. LEXIS 174 (Tenn. June 23, 2021).

---

[3] Our decision in *Moore v. Beacon Transport* is currently on appeal to the Tennessee Supreme Court's Special Workers' Compensation Appeals Panel.

*Id.* at *7 n.1; *see also Lavender v. Saturn Corp.*, No. M2002-00759-SC-R3-CV, 2003 Tenn. LEXIS 348, at *4 (Tenn. Workers' Comp. Panel May 5, 2003) ("We may make an independent assessment of the medical proof which is submitted by depositions, reports or records. We do not, however, disagree with the discretion exercised by the trial judge in this regard unless the record clearly shows an abuse of this discretion.").

Thus, we conclude a reviewing court can review documentary evidence, including expert depositions, *de novo* in order to determine where the preponderance of the evidence lies. However, with respect to the trial court's ultimate determination, a reviewing court should acknowledge the trial court's discretion to evaluate which expert's opinion is entitled to greater weight based on the totality of the evidence presented to the court and is to review such a determination under an abuse-of-discretion standard.

Employer then raises two issues, which we have restated as follows: (1) whether the trial court erred in determining Dr. Parsioon's causation opinion was entitled to a presumption of correctness; and (2) whether the trial court erred in concluding Employee was likely to prevail at a hearing on the merits in proving her herniated disc and need for surgery are more than 50% related to the April 4, 2020 work incident.

*Statutory Presumption of Correctness*

Tennessee Code Annotated section 50-6-102(14)(E) provides that "the treating physician" who was "selected by the employee from the employer's designated panel" is entitled to a presumption of correctness that is rebuttable by a preponderance of the evidence. Tenn. Code Ann. § 50-6-102(14)(E) (2021). We have previously addressed the various presumptions of correctness set out in Tennessee's Workers' Compensation Law:

> The Tennessee Workers' Compensation Act contains several provisions that favor certain opinions of a treating physician selected from a panel in accordance with Tennessee Code Annotated section 50-6-204(a)(3)(A)(i) (2016). For example, in section 50-6-102(14)(E), "[t]he opinion of the treating physician, selected by the employee from the employer's designated panel of physicians . . ., shall be presumed correct on the issue of causation but this presumption shall be rebuttable by a preponderance of the evidence." Additionally, section 50-6-204(a)(3)(H) states that "[a]ny treatment recommended by a physician or chiropractor selected pursuant to this subdivision (a)(3) or by referral, if applicable, shall be presumed to be medically necessary for treatment of the injured employee." Also relevant is section 50-6-204(a)(3)(E), which states that in circumstances where a treating physician makes a referral to a specialist, the specialist physician to whom the employee was referred "shall become the treating physician until the treatment by the specialist physician . . . concludes and the employee has

9

been referred back to the treating physician selected by the employee from the initial panel."

*Endsley v. Benchmark Contractors, LLC*, No. 2016-05-0743, 2017 TN Wrk. Comp. App. Bd. LEXIS 47, at \*5-7 (Tenn. Workers' Comp. App. Bd. Aug. 11, 2017).

Here, Employer takes issue with the trial court's conclusion that both Dr. Parsioon's and Dr. Murrell's causation opinions are presumed correct given that both physicians were selected from Employer's panels. Employer contends the court conflated the presumption of correctness set forth in Tennessee Code Annotated section 50-6-102(14)(E) with the presumption of correctness accorded to a physician pursuant to Tennessee Code Annotated section 50-6-204(a)(3)(A)(i). Employer further asserts the court "misinterpreted" our analysis in *Endsley* by stating in its order that "the presumption of correctness under section 102(14)(E) applies to the opinion of '*a* physician' selected from a panel, not only to the opinion of the current treating physician."

First, Employer argues that the phrase "a physician" does not appear anywhere in section 50-6-102(14)(E) but does appear in section 50-6-204(a)(3)(H), a provision of the statute dealing with the medical necessity of treatment, and asserts this is not an issue in the case at hand. Employer contends that "a physician" is a more general term and can apply to any physician that falls within the described category; whereas, when a statute references "the physician," as it does in section 50-6-102(14)(E), it can only mean one particular physician, namely the current authorized doctor. Conversely, Employee asserts that the statutory sections "warrant analogous interpretations" since both pertain to the presumption of correctness afforded to the authorized treating physician and "were intended to go hand-in-hand."

In *Endsley,* the employee was under the care of an authorized physician who did not believe that surgery was necessary. *Id.* at \*4. Following a referral for pain management, the employee requested a second opinion, which the employer provided. *Id.* at \*3. The second opinion physician opined that surgery was medically necessary and related to the work incident. *Id.* After a hearing, the court concluded that, as the initial physician was no longer the treating physician, his opinions were not entitled to a presumption of correctness and that the opinions expressed by the subsequent physician were entitled to greater weight. *Id.* On appeal, we considered the presumption of correctness afforded to each physician within the framework of Tennessee Code Annotated sections 50-6-204(a)(3)(H) and -102(14)(E). In doing so, we explained as follows:

> In considering the plain and ordinary meaning of these statutes, we note that subsection 204(1)(3)(H) applies the presumption of correctness to "*a* physician . . . selected pursuant to this subdivision (a)(3)" (emphasis added), not only to the current treating physician as implied by the trial court. Thus, we agree with Employer that [the initial authorized physician] remained an

authorized treating physician even after the referral to pain management and, to the extent [that physician] expressed opinions as described in subsections 102(14)(E) and/or 204(a)(3)(H), such opinions would be entitled to a presumption of correctness.

*Id.* at *6-7. Hence, we concluded that an authorized physician retained the presumption of correctness on the issue of causation even after the employee began treating with another authorized doctor, but, under the circumstances of that case, the presumption did not apply to the first doctor's opinion of the medical necessity of treatment recommended by a subsequent authorized physician.

In its brief on appeal, Employer contends that the facts of this case are distinguishable because Dr. Murrell "supplant[ed]" Dr. Parsioon as the authorized treating physician and, unlike in *Endsley*, was not chosen from a panel solely for the purpose of providing a second opinion on the issue of surgery and diagnosis pursuant to Tennessee Code Annotated section 50-6-204(a)(3)(C). Instead, Employer characterized Dr. Murrell as a "replacement treating physician" for Dr. Parsioon and argued that, as such, his opinion rather than Dr. Parsioon's should be entitled to the presumption of correctness on the issue of causation. Employer further contends that the legislature's use of the term "the treating physician" in section 50-6-102(14)(E) makes clear the legislature's intent for there to be only one physician entitled to the presumption of correctness on medical causation at any given time. We are unpersuaded.

The plain language of Tennessee Code Annotated section 50-6-102(14)(E) provides that "[t]he opinion of the treating physician, selected by the employee from the employer's designated panel of physicians . . ., shall be presumed correct on the issue of causation but this presumption shall be rebuttable by a preponderance of the evidence."[4] Here, Dr. Parsioon was selected from an Employer-provided panel of physicians and provided an opinion as to causation *while he was still the authorized treating physician*. After Dr. Parsioon indicated he was unable to perform surgery, Dr. Murrell was selected from an Employer-provided panel of physicians and, as the authorized treating physician, also provided a causation opinion. As such, both physicians provided causation opinions at the time they were authorized treating physicians, and, therefore, each opinion is entitled to the presumption of correctness in accordance with the plain language of section 50-6-102(14)(E). Employer has provided no legal authority to support its argument that the provision of a new or different causation opinion, even from a newly-designated authorized treating physician, serves to negate a previously offered causation opinion from an authorized, panel-selected physician. Thus, we discern no error in the trial court's

---

[4] During oral argument, counsel for Employer acknowledged that its insistence that there can be only one "treating physician" at a time whose causation opinion is entitled to a presumption of correctness is problematic in situations where, for example, a single work accident causes more than one injury, necessitating more than one treating physician for each injury.

conclusion that both Dr. Parsioon's and Dr. Murrell's causation opinions are presumed correct.

*Trial Court's Consideration of Medical Evidence*

Given our conclusions as stated above, it is unnecessary to address Employer's contention that the trial court erred in concluding that Employee came forward with "sufficient evidence to overcome the presumption of correctness afforded to Dr. Murrell's causation opinion." As both opinions were entitled to the presumption, we turn to the trial court's assessment of the weight of expert proof and its ultimate conclusion that Dr. Parsioon's opinion was more persuasive than that of Dr. Murrell. When a trial court is faced with competing medical expert opinions, the judge has the discretion to determine which opinion to accept and can consider, among other things, the qualifications of the experts, circumstances of their examinations, information available to each expert, and an evaluation of the importance attached to the information by other experts. *Bass v. The Home Depot U.S.A., Inc.*, No. 2016-06-1038, 2017 TN Wrk. Comp. App. Bd. LEXIS 36, at *9 (Tenn. Workers' Comp. App. Bd. May 26, 2017).

In considering the qualifications of each expert, the trial court first determined that both Dr. Parsioon and Dr. Murrell were well qualified and that this factor did not weigh in favor of either expert. However, the trial court noted that Dr. Parsioon saw Employee earlier than Dr. Murrell following the incident, which allowed Dr. Parisoon to assess Employee's complaints closer in time to the work accident. Further, the court noted that Dr. Parsioon saw Employee on more occasions than Dr. Murrell. With regard to the information available to each doctor, both physicians examined Employee on multiple occasions, and each reviewed the initial MRI and chiropractic records. Although Dr. Parsioon did not see Employee's chiropractic records before providing his initial causation opinion, after reviewing the records, he testified that his opinion had not changed. In addition, after reviewing the video of Employee's work incident, Dr. Parsioon testified that "you can't have a better traumatic injury . . . for a ruptured disc in the spine."

Although Dr. Parsioon acknowledged he did not review the second MRI, Dr. Murrell testified that the second study revealed "similar, if not the same" findings as the imaging performed in April 2020. With regard to the importance each expert attached to information it reviewed, the trial court noted that Dr. Murrell attached greater weight to the chiropractic records than Dr. Parsioon. In considering the reasoning of each provider, the court noted that Dr. Parsioon testified Employee's chiropractic records essentially replicated consistent notes and findings typical of treatment provided by chiropractors, and did not suggest the presence of radiating pain or a herniated disc that would merit referral to a specialist. Conversely, Dr. Murrell relied upon the pain complaints and chiropractic treatment described in these records to formulate an opinion that Employee's condition and need for surgery are not more than 50% related to her employment. Despite this, when deposed, Dr. Murrell first testified that Employee's need for recommended surgery and

12

diagnosis of the L5-S1 disc injury was more than fifty percent related to the work injury, then testified to the contrary on cross-examination before ultimately stating that the "waters are sort of muddy" and "it will be up to the workers' compensation judge to decide whether this gets addressed." Thus, after considering the above factors, the trial court accorded Dr. Parsioon's causation opinion greater weight than the equivocal testimony of Dr. Murrell. Under these circumstances, given the trial court's discretion to give greater weight to the opinion of the physician who offered the more probable explanation of causation, we conclude it was not error for the trial court to assign greater weight to the causation opinion of Dr. Parsioon.

Finally, the trial court determined Employee testified credibly that her disabling symptoms occurred after the work incident. In addition, Employee was able to explain to the court's satisfaction photographic evidence offered by Employer related to her post-injury activities. After considering the medical proof in conjunction with Employee's lay testimony, the trial court concluded Employee was likely to prevail at a hearing on the merits in proving her herniated disc and need for surgery are more than 50% related to the April 4, 2020 work incident. We discern no error in this regard.

## Conclusion

For the foregoing reasons, we conclude the evidence does not preponderate against the trial court's determinations. We affirm the trial court's order and remand the case for any further proceedings that may be necessary. Costs on appeal are taxed to Employer.



# TENNESSEE BUREAU OF WORKERS' COMPENSATION
# WORKERS' COMPENSATION APPEALS BOARD

| | | |
|---|---|---|
| Kaci L. Johnson | ) | Docket No. 2020-08-0731 |
| | ) | |
| v. | ) | State File No. 23720-2020 |
| | ) | |
| Inspire Brands d/b/a | ) | |
| Blazin Wings, Inc., et al. | ) | |
| | ) | |
| | ) | |
| Appeal from the Court of Workers' | ) | Heard August 10, 2022 |
| Compensation Claims | ) | via Microsoft Teams |
| Allen Phillips, Judge | ) | |

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the Appeals Board's decision in the referenced case was sent to the following recipients by the following methods of service on this the 7th day of September, 2022.

| Name | Certified Mail | First Class Mail | Via Fax | Via Email | Sent to: |
|---|---|---|---|---|---|
| A. Allen Grant | | | | X | agrant@eraclides.com<br>bnorris@eraclides.com<br>kewing@eraclides.com |
| Monica R. Rejaei | | | | X | mrejaei@nstlaw.com<br>atarbania@nstlaw.com |
| Allen Phillips, Judge | | | | X | Via Electronic Mail |
| Kenneth M. Switzer, Chief Judge | | | | X | Via Electronic Mail |
| Penny Shrum, Clerk, Court of Workers' Compensation Claims | | | | X | penny.patterson-shrum@tn.gov |

_Olivia Yearwood_

Olivia Yearwood
Clerk, Workers' Compensation Appeals Board
220 French Landing Dr., Ste. 1-B
Nashville, TN 37243
Telephone: 615-253-1606
Electronic Mail: WCAppeals.Clerk@tn.gov